UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

**NOT FOR PUBLICATION**

| | |
|---|---|
| RAMONA VARGAS, | |
| Plaintiff, | |
| v. | Civ. Action No. 07-3586 (KSH) |
| COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | **OPINION AND ORDER** |

**Katharine S. Hayden, U.S.D.J.**

The Social Security Administration seeks to press upon this District a new practice: routing through the claimant the legal fees payable under the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412, after a successful appeal of the denial of Social Security benefits, as opposed to paying the fee award directly to the attorney. The benefit to the successful claimant is non-existent; to the contrary, as this opinion discusses, the practice is harmful. The benefit to the government is clear: an offset may be charged against the award should a litigant owe the government money. Although the Commissioner loses, another agency may recover. This "Not So Fast" policy is fiercely challenged by the law firm that represents Ramona Vargas.

The fees at issue amount to $4,232.75, in federal litigation circles, a sum that is modest. The issues raised are anything but.

**I. Ramona Vargas Litigation**

**A. Procedural Facts**

Ramona Vargas filed an application for Supplemental Security Income benefits on June 1, 2004, which was denied at the initial and reconsideration levels. After a hearing, an Administrative Law Judge denied benefits. Vargas filed for review before the Appeals Council, which found no grounds to review. Vargas timely appealed to the District Court, and her attorney Abraham Alter

1

filed a brief, raising, among other issues, the ALJ's failure to follow Third Circuit precedent in <u>Sykes v. Apfel</u>, 228 F.3d 259 (3d Cir. 2000) and <u>Poulos v. Comm'r of Soc. Sec.</u>, 474 F.3d 88 (3d Cir. 2007).

Ten days later, the case settled. Mr. Alter submitted a Consent Order executed by himself and government counsel, which provided for a remand for consideration of issues consistent with the arguments he made in the brief on appeal. Thereafter he filed a motion for an award of fees and costs under the EAJA[1] seeking compensation for 26.25 hours at $161.25 per hour. He enclosed a proposed form of order providing that "plaintiff's attorneys are awarded attorney's fees and costs" in the amount of $4,232.75, which this Court signed before the return date of the motion. The government responded to the motion with a letter objecting not to the entitlement to an award or to the amount sought, but rather to the designated payee. The government's proposed amended order recites in full:

> **AMENDED ORDER FOR PAYMENT OF FEES PURSUANT TO THE EQUAL ACCESS TO JUSTICE ACT**
>
> This matter having been opened to the Court by Abraham S. Alter, attorney for plaintiff, for an Order awarding attorney fees pursuant to the Equal Access to Justice Act, (28 U.S.C. § 2412), and it appearing that Christopher J. Christie, United States Attorney (Jennifer S. Rosa, Special Assistant United States Attorney, appearing), attorney for defendant, having consented to the entry of an Order awarding an amount of four thousand two hundred thirty-two dollars and seventy-five cents ($4,232.75), the Court having reviewed the record in this matter;
>
> IT IS on this day of , 2008;
>
> ORDERED that plaintiff is awarded fees under the Equal Access to Justice Act in the amount of four thousand two hundred thirty-two dollars and seventy-five cents ($4,232.75).

---

[1] The EAJA provides that "a court shall award to a prevailing party other than the United States fees and other expenses, in addition to any costs awarded pursuant to subsection (a), incurred by that party in any civil action (other than cases sounding in tort), including proceedings for judicial review of agency action, brought by or against the United States in any court having jurisdiction of that action, unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust." 28 U.S.C. § 2412.

2

Both Special AUSA Rosa and Mr. Alter submitted letters concerning the appropriate payee.  Ms. Rosa cited to Manning v. Astrue, 510 F.3d 1246 (10th Cir. 2007), as the main support for the amended order.  Mr. Alter objected based on two arguments: the intent of the EAJA is to pay for attorney's fees, which under the government's proposed order might not be remitted timely, in full, or at all by an indigent claimant receiving a check for thousands of dollars; and as Manning demonstrates, an award nominally payable to the claimant is exposed to offsets based on debts to the United States unrelated to the litigation before the Social Security Administration.

This Court decided to explore the facts asserted by Mr. Alter and requested both sides to provide more information.  From Ms. Rosa, the Court sought information about any potential offset against the $4,232.75 deemed payable to Ms. Vargas; and if that information wasn't available, then the Court asked what procedure would be implemented to explore offsets and how long that would take.  The Court directed the following inquiry to Mr. Alter:  "[I]f the Commissioner, through Ms. Rosa, hands over to Ms. Vargas in this courtroom a check that is made payable to Ms. Vargas and your firm, will Ms. Vargas agree to be present and will she endorse the check to you?"

The Court's letter produced two responses, which are examined in turn.

**B. Government Response to Court's Inquiry**

According to Ms. Rosa, the process for determining if there will be an offset charged against the approved fee award is a do-it-yourself affair:

> The Court asked the Commissioner to determine whether there is a potential offset that will be applied to the $4,232.75 prior to payment to Ms. Vargas.  As an initial matter, the Commissioner notes that it is plaintiff who is in the best position to know whether she has any debt owed to the government that could create an offset. The Commissioner of SSA does not have a way to predetermine whether plaintiff has a qualifying debt.  The Department of the Treasury, Financial Management Service operates the Debt Management Service's Treasury Offset Program. Information concerning this program is accessible at: http://fms.treas.gov/debt/top.html.  The Department of the Treasury also has a phone number to an automated system in which the plaintiff can put in her social security number to determine if there is a debt that would subject any qualifying payment to offset.  The phone number is 1-800-304-3107.  Plaintiff can also give permission to her attorney, to check the system.  The Department of the Treasury has a specific form

>that needs to be completed and signed by the plaintiff as proof that the person checking the system was given permission by plaintiff to check the system. The form can be accessed at http://www.fms.treas.gov/DEBT/dmconsent.pdf. A copy of the form is attached. The Commissioner cannot, in good faith, make a firm representation to the court that plaintiff's EAJA monies will not be subject to an offset because it is possible for plaintiff to incur a debt to the Government prior to the payment of the EAJA fee (e.g. plaintiff failed to satisfy her federal income tax obligation).

(Def.'s Mar. 6, 2008 Letter to the Ct. 1-2, docket entry # 19.) The foregoing is not helpful to the Court. It fails to answer the question of whether the government intends to issue a check to Ms. Vargas for less than the $4,232.75 agreed to by the Commissioner. And it fails to inform the Court whether the government will be moving under the Debt Collection Improvement Act, 31 U.S.C. § 3716; 31 C.F.R. § 285.5(a)(1), the very statutory authority for the offset approved in the Manning case.

Ms. Rosa adds in her letter that "it is the Agency's practice that when a district court orders payment of EAJA fees to the plaintiff, the government sends such fees to plaintiff, care of the attorney [....] We believe that this approach obviates the need to have the parties appear before the Court for a tendering of the check." (Def.'s Mar. 6, 2008 Letter to the Ct. 2.)

Ms. Rosa glosses over the fact that this dispute arises because the Agency is *changing* its practice of sending the fee award to the attorney who earned it. And the prediction that the new practice "diminish[es] the possibility that plaintiff will deplete the funds before paying counsel's fee," ignores the competing interests inherent in designating both plaintiff and the law firm as payees. (Def.'s Mar. 6, 2008 Letter to the Ct. 2.)

### C. Plaintiff's Attorney's Response

Initially, it must be stated that the law governing appeals of adverse decisions of the Commissioner of Social Security is complicated and the issues often nuanced. The regulations present a maze of steps and terms and practices that can be confounding; the record of each appeal is packed with agency forms and medical reports. The district judge is required to apply a standard

of review that combines deference to the decision of the ALJ with a rigorous attention to how the decision was made: does substantial evidence support it? Over the years, the Third Circuit has offered guidance, but applying Circuit decisions always demands a serious intellectual effort.

Abraham Alter has practiced in this area for more than 25 years. He argues in his response that the history of the EAJA demonstrates a legislative commitment to making it possible to "fight City Hall," something otherwise impossible given the resources of the federal government. As he puts it, "The theory of the EAJA statute, the reason it was enacted and re-authorized permanently is the undeniable reality that one needs an attorney in order to assert a claim or dispute the denial of a right against the United States government." (Pl.'s March 6, 2008 Letter to the Ct. 2, docket entry # 20.) Whether the "undeniable reality" is based on the plain orneriness of the law – it's complicated and hard to understand -- or the limited circumstances of the person asserting the claim, or both, Mr. Alter is right.

Mr. Alter points out that if Ramona Vargas had somehow represented herself and prevailed, no EAJA fee award would have been made: "[s]he wouldn't get EAJA because EAJA exists only and exclusively *to pay attorney's fees*." He asks, "[t]his being undeniably true, why wouldn't we send the EAJA check in the name of the attorney who earned it, moved for it, substantiated the hourly basis for it and (in many cases) advanced the Court costs and filing fees for it?" (Pl.'s March 6, 2008 Letter to the Ct. 4-5.) Mr. Alter is right to ask, and the Court is hard-pressed to answer.

Addressing the scenario the Court posed in which Ms. Vargas would appear and indicate whether she was prepared to sign over the check that AUSA Rosa presented, Mr. Alter gives an unvarnished forecast about how that would play out. "The undersigned will go to Ms. Vargas' uncle's house (where she now lives), pick her up and bring her to Court. Once there, Your Honor and Ms. Rosa, Esq. can take turns explaining why Mr. Alter gets $4,232.75 on account of representing her on her Social Security case while she still gets nothing but the opportunity to go

back to square one." (Pl.'s March 6, 2008 Letter to the Ct. 5.) That point hits home with everyone who has ever represented an individual, and is exactly the response the Court expected.

The over-arching question Mr. Alter poses is, simply, if the new practice is implemented, who will represent the Ramona Vargases? Focusing on this case, Mr. Alter describes the situation bluntly:

> "[Ms. Vargas] comes to my office five months down on rent, too sick to work, facing eviction and collecting the enormous sum of $210.00 a month. She can offer me nothing but a story. Why would I take her case? Even if I win her case, which by the way I did, what would I earn, another remand? Remands don't pay attorney's fees. It doesn't take much imagination to realize that if attorneys aren't paid EAJA fees directly they would have no economic motivation to accept District Court work on behalf of Social Security claimants."

(Pl.'s February 28, 2008 Letter to the Ct. 5, docket entry # 16.) That is not hyperbole. When a practicing lawyer from the private sector interviews a client, what is usually offered is "nothing but a story." The next step is a fee agreement. However, beyond the mundane fact that Abraham Alter, like everyone, has bills and mortgages and tuitions to pay, there is something bigger involved here.

The Commissioner's proposed amended EAJA order has two scenarios embedded in it. First, that the fee award earned by the attorney will be reduced by acts and debts of his/her client unrelated to the attorney's representation and arguably unknown to the attorney and even the client. (See Def.'s Mar. 6, 2008 Letter to the Ct.) Second, that the client and the attorney become competing suitors for the fee award. (See Def.'s Mar. 6, 2008 Letter to the Ct.) Mr. Alter states it this way:

> The public policy argument needn't be explicated expansively. Poor people are going to owe monies to everyone including the Federal government. By and large, poor people are going to predominate in Social Security litigation. These same poor people cannot walk into a lawyer's office with $2,500.00 in retainer fees. Thus, poor people will not be able to do as Ms. Vargas has done, that is, to argue in Federal Court a position that we now know to be established fact: that the government issued four decisions, each of which ran afoul of its own regulations. The EAJA Statute exists for no other purpose and certainly for no better purpose than to allow Ms. Vargas the opportunity to make that argument. The EAJA statute tells Ms. Vargas[,] "make your argument, and if you're right, we will pay your attorneys."

(Pl.'s March 6, 2008 Letter to the Ct. 5.) This argument is very persuasive. Before accepting it, however, the Court must determine if it will follow the reasoning in Manning.[2]

## II. Examining the Manning Decision

In Manning, 510 F.3d at 1254-1255, the Tenth Circuit identified the "prevailing party" to whom an EAJA fee award is paid as the plaintiff, the claimant, the individual who successfully challenged the government, and not the attorney who earned the fees associated with the successful result. Analogizing to other statutes and citing holdings in cases discussing fee shifting awards, the Manning decision rejected the arguments posed by plaintiff Janet Manning, which mirror some of those made on behalf of Ramona Vargas. At the end of the decision, court noted:

> Although we conclude that the award of EAJA attorney's fees is to Ms. Manning and not to her attorney, we recognize that perhaps the answer is not as clear as it would appear to be from the statutory language, legislative history, and case law. Admittedly, it seems counter intuitive to hold that an award of attorney's fees does not go to the attorney, especially since the EAJA fees are calculated based on the time spent by the attorney and based on the attorney's hourly rate, *see* 28 U.S.C. § 2412(d)(1)(B), (2)(A). Indeed, the answer to the question "who do the fees go to" was not clear to the government, because it switched positions during the course of this litigation. In the district court, it consistently took the position that the award belonged to the attorney. But on appeal, it took the position that the award belonged to Ms. Manning. Despite the government's confusion, we are bound by the statutory language, legislative history, and case law, which has been set forth in detail above.

Id. at 1255 (footnote omitted).

Notably, the Manning court rejected as "purely speculative" the plaintiff's argument that paying all EAJA fees directly to the claimant would have a chilling effect on claimants' ability to obtain representation. Id. at 1254. For this, it relied on Supreme Court precedent in Evans v. Jeff D., 475 U.S. 717 (1986), which approved a fee waiver as part of a settlement of a class action brought against state officials on behalf of children suffering from emotional and mental handicaps. The reasoning was that the fees belonged to, and could therefore be waived by, the successful plaintiffs. The fee-shifting statute in Jeff D. was the Civil Rights Attorney's Fees Awards Act of 1976, 42

---

[2] According to Mr. Alter, this issue has been presented to the Third Circuit, which will, of course, have the final word.

U.S.C. § 1988, which "bestowed upon the 'prevailing party' (generally plaintiffs) a statutory eligibility for a discretionary award of attorney's fees in specified civil rights actions." From the decision:

> The question this case presents . . . is whether the Fees Act requires a district court to disapprove a stipulation seeking to settle a civil rights class action under Rule 23 when the offered relief equals or exceeds the probable outcome at trial but is expressly conditioned on waiver of statutory eligibility for attorney's fees. For reasons set out below, we are not persuaded that Congress has commanded that all such settlements must be rejected by the District Court. Moreover, on the facts of record in this case, we are satisfied that the District Court did not abuse its discretion by approving the fee waiver.

Id. at 729-30.

Jeff D. has a dissent, written by Justice Brennan and joined by Justices Marshall and Blackmun, which minces no words:

> [I]t does not require a sociological study to see that permitting fee waivers will make it more difficult for civil rights plaintiffs to obtain legal assistance. It requires only common sense…[T]he cumulative effect this practice will have on the civil rights bar is evident. It does not denigrate the high ideals that motivate many civil rights practitioners to recognize that lawyers are in the business of practicing law, and that, like other business people, they are and must be concerned with earning a living.  The conclusion that permitting fee waivers will seriously impair the ability of civil rights plaintiffs to obtain legal assistance is embarrassingly obvious.

Id. at 755-59 (footnote omitted).

If Manning is informed by Jeff D., it is important to recognize that what moved the majority opinion in the face of a vigorous dissent does not apply here.  The majority was concerned with the uncertainty of fee awards in class actions, many of which sought injunctive relief.  The opinion cited comments by legislators and others that in some cases the expenses for the lawyers were greater than the relief obtained. Id. at 731-733.  It discussed findings by a Third Circuit Task Force that approved fee negotiations to assure defendants about the scope of their liability, thereby making settlement more attractive.  Id. at 737 n. 28.

None of these concerns applies here. The fees awarded after a successful appeal of the Commissioner's ruling are modest and relate to the representation of one client. There is neither uncertainty nor the anomaly that the fee award will be greater than the benefit to the client. If <u>Jeff D.</u> delivers any message, it is the warning by the dissenters about the potential impairment to the ability of litigants to obtain counsel. The <u>Manning</u> court's characterization as "pure speculation" that it is dangerous to pay EAJA fees directly to the claimant appears to this Court as wishful thinking.

Not to be overlooked is that the <u>Manning</u> decision heaps on the plaintiff the tax obligation on the fee award. <u>Id.</u> at 1254.³ Also, as authority for approving an offset for unpaid student loan debts, the decision reasons that since student loans may be offset against Social Security benefits, then EAJA awards may be treated likewise. Inherently, then, the decision treats the EAJA fee award as income to the claimant, which mangles the intent of the statute. And in neither context does the opinion discuss the impact that taxing and diminishing the fee award will have on the ability (or even the inclination) to obtain counsel.

### III. Examining the Debt Collection Improvement Act

The Tenth Circuit is silent on the offset procedure mandated by the Debt Collection Improvement Act, 31 U.S.C. § 3716, the vehicle for the offset approved in the <u>Manning</u> case. Factually, it appears that Manning and her attorney were taken by surprise by the reduction in the requested fee; indeed, the attorney thought at first there had been a clerical error. (Br. of Appellant 13, 2007 WL 760103.) This means we do not have guidance about how the Act might apply in this case under the new practice contemplated by the Commissioner's proposed amended order.

The Debt Collection Improvement Act ("the Act") became law on April 26, 1996, as part of the Omnibus Consolidated Rescissions and Appropriations Act of 1996. The primary purpose of the

---

³ Does this mean that the prevailing plaintiff pays taxes on the fee award, and then the attorney to whom the plaintiff pays the equivalent amount of the award pays taxes as well?

9

Act is to increase the collection of nontax debts owed to the Federal Government, and it grants the Department of the Treasury's Financial Management Service the authority to collect nontax debts owed to the United States government by offsetting payments made by other federal agencies. See 31 U.S.C. § 3716; 31 C.F.R. § 285.5(a)(1). Significantly, the Act sets out procedural steps that promote government accountability and afford due process to the alleged debtor:

> The head of the agency may collect by administrative offset *only* after giving the debtor-- (1) written notice of the type and amount of the claim, the intention of the head of the agency to collect the claim by administrative offset, and an explanation of the rights of the debtor under this section; (2) an opportunity to inspect and copy the records of the agency related to the claim; (3) an opportunity for a review within the agency of the decision of the agency related to the claim; and (4) an opportunity to make a written agreement with the head of the agency to repay the amount of the claim.

31 U.S.C. § 3716(a) (emphasis added). Ms. Rosa alludes to the Act obliquely when she states that Department of the Treasury's Financial Management Service, the clearinghouse for the implementation of the Act, provides information for debtors through its website. (See Def.'s Mar. 6, 2008 Letter to the Ct. 1-2) Significantly, Ms. Rosa is silent on the amount of time involved in the process, which appears significant. Assuming the process is triggered against a fee award, this means delay in releasing funds, whereas it is common that an attorney seeking to get paid will already have been working without compensation for years.

But there is more: using EAJA funds as a target for the collection process creates what can best be characterized as an incentive tug of war. There is a strong disincentive for a claimant-payee of an EAJA award to avail herself of the due process rights set forth in 31 U.S.C. § 3716(a), which on its face subjects the government's efforts to collect on a debt to procedural protections benefiting the individual. If an individual can eradicate a debt out of funds other than her own benefits by promptly assenting to an offset against an EAJA award, why wouldn't she do that? Once notified of a claim asserted by a government agency to be paid out of the EAJA award, executing a consent and waiver makes perfectly good sense if the money would otherwise be earmarked for the attorney.

10

Paying with someone else's money is a boon.  And there is no consequence to a consent and waiver: it can't be seriously argued that the client in a Social Security case, who is usually granted IFP status, has other funds available to pay counsel.   An offset against the EAJA award, therefore, puts the client's interests squarely in conflict with her lawyer's interest in getting paid.

And it streamlines the process of collection dramatically.  The government has a strong incentive to go after EAJA funds knowing that the recipient of an EAJA award will readily waive further process.  A creditor agency gets paid faster and avoids the tangle of notice requirements and payout agreements (such as might be required if the debtor's asset was, for example,  the stream of benefits payable by the Commissioner as the result of a successful appeal).  Meanwhile the intended recipient, the claimant's lawyer who won the case and has the biggest incentive to fight, is relatively helpless.  Assuming the attorney is eligible for an assignment of the EAJA award for the purpose of fighting the offset, which is not assured, the next steps become comic.  Isn't the client still involved?  How much cooperation is the attorney going to get?  If the attorney wins, doesn't the client lose?  How can there be a negotiated conclusion?  And why, for a fee averaging $4000 to $5000, would a lawyer embark on this quixotic exercise?  Should the lawyer get a lawyer to disprove the debt so that if s/he is successful, an EAJA award is available?

The Court is not posing the above questions rhetorically; the Court is simply following the path that the Act prescribes, unguided by useful information from the Commissioner and noting that <u>Manning</u> does not speak to these points.  And following that path, the Court concludes that permitting an offset against an EAJA fee award under the authority of the Department of the Treasury's Financial Management Service, as the Commissioner indicates may be the next step here and in any future case where the Court approves a fee under the EAJA, distorts the EAJA and the Debt Collection Improvement Act in a most cynical way.  Opportunism and efficiency are not virtues when they interfere with the relationship between the people of severely limited means who make these appeals and the attorneys who represent them.

11

**IV. Conclusion**

The Court perceives that signing the proposed amended order transforms the successful attorney into an escrow agent and will boost the collection power of the government while eroding the procedural protections that keep the Debt Collection Improvement Act honest. In sum, this Court is not persuaded that the analysis in Manning[4] fully addresses the issues presented here. As a consequence, the Court will follow the established practice of disbursing EAJA legal fees directly to counsel. For years and years, EAJA fee awards in this District have been made directly to the attorneys representing the prevailing plaintiffs; the "ownership" of the awards up to now has been obvious and unremarkable. In one stroke, the practice being urged on the district court reduces professional work to a collection opportunity for the government and a collection nightmare for the attorney. That is simply insupportable. Mr. Alter, whose arguments on behalf of Ms. Vargas were sophisticated and well-supported, deserves to be paid promptly and in full. And as the prevailing party, plaintiff deserves to have those fees paid to Mr. Alter promptly and in full.

The Court will not amend the order appearing on the docket as entry # 14 and dated February 20, 2008. That order awards fees under the EAJA payable to plaintiff's attorneys, and it remains in effect. As a consequence, plaintiff's request for oral argument is denied as moot.

**SO ORDERED** this 12th day of March, 2008.

/s/   Katharine S. Hayden

Katharine S. Hayden, U.S.D.J.

---

[4] The government cites three other cases as authority for the proposed amended order, but it is evident that the months-old Manning decision is the real basis for the government's position on Mr. Alter's motion. Two of the "claimant as prevailing party" cases, Phillips v. General Services Admin., 924 F.2d 1577 (Fed. Cir. 1991) and Oguachuba v. INS, 706 F.2d 93, 98 (2d Cir. 1983), are decades old and unpersuasive enough that up until now, the government did not follow them. Neither addresses EAJA awards to successful claimants in appeals to the district court after the Commissioner denied benefits. And the third, McGraw v. Barnhart, 450 F.3d 493, 496 (10th Cir. 2006), did not involve an EAJA fee award, but rather 42 U.S.C. § 406(b)(1), a distinguishable fee award provision that allows a court to award fees as part of its judgment out of, and not in addition to, the amount of past-due benefits.

Case 2:07-cv-03586-KSH   Document 21   Filed 03/12/08   Page 13 of 13 PageID: 103

13